Frank J. DeMARCO, Appellant

v.

Barbara A. DeMARCO, Appellee.

Superior Court of Pennsylvania.

Argued March 13, 2001.

Filed Dec. 13, 2001.

---

Daniel L. Goodyear, Pittsburgh, for appellant.

Nancy J. Norkus, Pittsburgh, for appellee.

Before: ORIE MELVIN, TODD, and KELLY, JJ.

ORIE MELVIN, J.

¶ 1 Appellant Frank DeMarco (Husband) asks us to determine whether the trial court properly valued his police pension fund for purposes of equitable distribution as if he retired at age fifty, even though he continues to work with no immediate plans to retire. We hold that it was error to simply value Husband's pension as of the date the plan vested, without regard to certain factors that must be established in the record and considered

by the trial court before setting a retirement date, as a reference point, to value a pension. Accordingly, we reverse and remand for an evidentiary hearing consistent with this opinion.

¶ 2 The trial court set out the relevant facts and procedural history of this appeal as follows:

Plaintiff, Frank J. DeMarco ("Husband") and Defendant, Barbara A. De-Marco ("Wife") were married on January 17, 1970 and separated after twelve (12) years on July 2, 1982. Husband became employed as a police officer with the City of Pittsburgh on January 12, 1970, just five (5) days prior to the parties' marriage and he continued in this employment throughout the marriage and through trial. Wife was not gainfully employed during the marriage as Husband insisted that she be a homemaker and primary caregiver to the parties' children, Frank, Jr., born February 21, 1971 and Roxanne, born October 20, 1977. After the parties separated in 1982, Wife remained in the marital residence with the children and Husband voluntarily paid support to Wife of $700 per month until April 29, 1996, when the parties entered into a Consent Order whereby Husband paid Wife Alimony Pendente Lite of $740 per month. At the time of trial, Husband was fifty-one (51) years of age and Wife was fifty (50) years old.

The parties pursued their respective claims for equitable distribution of marital property, alimony and counsel fees at trial on September 21, 1998. The Court issued its Findings and Order on October 29, 1998, in which the [value of the] marital component of Husband's pension from the Pittsburgh Police Department was determined to be $104,455 based upon a projected retirement age of 55 in 2002. Thereafter, Wife presented a Motion for Reconsideration which included, *inter alia,* an assertion that the Court

erred in failing to value Husband's pension as of April 1, 1997, which is the first day of the month following Husband's 50th birthday, and the date on which Husband first became eligible to receive full pension benefits following twenty (20) years of service. The Court granted Wife's Motion for Reconsideration, and after review of the briefs of the parties and oral argument, the Court issued an Order on March 16, 1999 which amended the October 29, 1998 Findings and Order and ruled that the marital component of Husband's pension should be and is valued at $153,903 at age 50 rather than $104,455 at age 55. Regarding Wife's ancillary claims on reconsideration, the Court granted either party leave to request a conciliation or hearing for the presentation of further testimony and evidence. A hearing was conducted on June 30, 1999, and the Court issued its final Order on July 13, 1999, which reiterated the Court's March 16, 1999 valuation of the marital component of Husband's pension at $153,903. The July 13, 1999 Order provides in pertinent part:

The marital value component of [Husband]'s Pittsburgh Police Pension is found to be $153,903, which is the value attributed by the only expert witness, James Lynch, to [Husband]'s fully vested pension at age fifty (50) following twenty (20) years of service. The calculation of the marital component of [Husband]'s pension is based upon the date of [Husband]'s actual eligibility for retirement at full benefit.

Trial Court Opinion, 12/8/99, at 1–3. Ultimately, the trial court valued the marital estate at $208,535.00. The court awarded Wife 60% of the marital estate or $125,121.00. This award consisted of the marital residence and roughly one-half of

the marital portion of Husband's police pension. The court awarded Husband the remaining 40% of the marital estate and ordered Husband to pay Wife alimony in the amount of one hundred ($100.00) dollars per month for twenty (20) years. The trial court reasoned that the purpose of the alimony was to enable Wife to purchase an insurance policy on Husband's life, to guarantee payment of her equitable share of Husband's police pension, allegedly based on the fact that Husband's pension does not have a spousal survivor benefit. This appeal followed.[1]

¶ 3 Husband raises the following issues on appeal:

- WHETHER THE TRIAL COURT ERRED AS A MATTER OF LAW AND/OR ABUSED ITS DISCRETION WHEN IT PRESENTLY VALUED [HUSBAND'S] RETIREMENT BENEFITS AT AGE FIFTY EVEN THOUGH [HUSBAND] CONTINUED TO WORK?
- WHETHER THE TRIAL COURT ERRED AS A MATTER OF LAW AND /OR ABUSED ITS DISCRETION BY DENYING THE [HUSBAND] A CHOICE OF WHERE TO WORK?
- DOES [HUSBAND'S] DESIRE TO CONTINUE IN HIS PRESENT EMPLOYMENT CONSTITUTE AN EFFORT TO DISSIPATE THE VALUE OF A MARITAL ASSET?

Appellant's Brief at 8.

¶ 4 In each of these issues, Husband challenges the trial court's valuation of his pension as if he had retired at age fifty. Husband asserts that the trial court erroneously valued his pension at age fifty because he worked past that age and at the time of trial was in fact fifty-two years

old. Moreover, Husband avers that the trial court should have valued his pension as if he would retire at the average retirement age of sixty-five. Husband maintains that the trial court interfered with his right to choose where and for how long he works when the court fixed the value of his pension as if he had retired at age fifty, which was when he was first eligible for full retirement benefits. Finally, Husband suggests that the court should have retained jurisdiction over the property distribution because the assets of the marital estate were not great enough to offset the marital value of Husband's pension at the time the marital estate was divided. Wife, on the other hand, agrees with the trial court. She contends that the longer Husband works, the less his pension is worth. She suggests Husband is actually dissipating this marital asset with his continued employment. For the following reasons, we reject Wife's position and share Husband's concerns.

Our scope of review of an order of equitable distribution is limited. Such awards are within the sound discretion of the trial court, and will not be disturbed absent an abuse of discretion. An abuse of discretion will be found by this court only if the trial court failed to follow proper legal procedures or misapplied the law.

*Litmans v. Litmans,* 449 Pa.Super. 209, 673 A.2d 382, 386 (1996).

¶ 5 For a better understanding of the complexity of the problem of pension valuation for a defined benefit plan where the employee spouse has yet to retire, we must first understand the nature of retirement benefits. Pensions are simply deferred compensation from the employer for services rendered by the employee. They are

---

1. Husband previously appealed the equitable distribution order on August 13, 1999. That appeal was quashed *"Per Curiam"* as interlocutory. Following remand, the divorce decree was granted on May 25, 2000. The matter is now properly before us for review.

a type of intangible property because they represent a contractual right to future benefits payable upon retirement. Pension plans are generally one of two types: the defined contribution plan and the defined benefit plan.

A defined benefit plan is one in which the employer promises a certain benefit; a defined contribution plan is one in which the employer promises a certain contribution.

In a defined benefit plan, the benefit which is promised is calculated by a formula defined in the pension plan provisions. The employer pays a specified benefit at retirement. In some defined benefit plans, the employee contributes nothing; in others, the benefits are based, in part, on what the employee contributes. The employer's contribution to the plan, however, varies from year to year based on the amount which is needed at any particular time to pay the benefits which are due. Individual accounts of each employee's contribution, if any, are maintained, but these accounts do not specify an employer contribution.

In a defined contribution plan, however, individual accounts specify not only the employee's contribution, but the employer's as well. The benefits to be paid in the defined contribution plan, however, unlike those in the defined benefit plan, are not fixed, for they depend upon the performance of investments which are made with the contributions.

Because of the distinct nature of each of these plans, their method of valuation is different as well.

\* \* \*

### Valuing the defined benefit plan

It is the *defined benefit plan which raises significant valuation problems.* Un-

like the defined contribution plan, there is no individual account statement which provides the parties with the value of the plan at regular intervals. All we know is that if the employee stays alive and on the job until retirement, he will be entitled to receive a specified monthly payment for the balance of his life.

[\* \* \*]

Defined benefit plans are valued by actuarially determining their present value.... The calculation of a present value requires discounting for mortality, based upon group annuity mortality tables, discounting for interest, and discounting for the probability that the employee will remain with the company to retirement age. All of the various factors can be considered by the actuary in determining the present value of the plan.

\* \* \*

[T]he vast majority of reported decisions deal with the valuation and distribution of defined benefit pension plans, and the coverture fraction calculations are an important part of the analysis in these decisions. The numerator of the coverture fraction represents the number of years the parties were married, and the denominator represents the number of years the employee/spouse participated in the plan.

While the coverture fraction is an essential component of this formula for determining marital portion of the defined benefit plan, it is not an essential factor in the valuation process itself. The coverture fraction is merely a way to calculate what portion of a pension adjusted to present value.

\* \* \*

The use of a coverture fraction has nothing to do with the valuation of a pension plan itself. Rather, its sole purpose is to determine what part of the value of

the plan is attributable to the years of marriage and hence marital property subject to equitable distribution. However, if this marital portion is clear from the records of the plan itself, the use of the coverture fraction is unnecessary and potentially unfair to either the employee or non-employee spouse.

*Paulone v. Paulone,* 437 Pa.Super. 130, 649 A.2d 691, 693–695 (1994).

¶ 6  Additionally, Pennsylvania law provides two methods to distribute a pension when dividing the assets of a marital estate. *Miller v. Miller,* 395 Pa.Super. 255, 577 A.2d 205 (1990), *appeal denied,* 525 Pa. 664, 583 A.2d 794 (1990), *appeal after remand,* 421 Pa.Super. 23, 617 A.2d 375 (1992). The first method, "immediate offset," awards a percentage of the marital portion of the value of the pension to the party earning it and offsets the marital value of this pension with other marital assets at the time the estate is divided. *Id.* This method is preferred where the estate has sufficient assets to offset the pension, because it does not require the court to retain jurisdiction indefinitely. *Id.* The second method, "deferred distribution," generally requires the court to retain jurisdiction until the pension is collected, at which point the pension is divided according to the court's order. *Id.* This method is more practical where the parties lack sufficient assets to offset the marital value of the pension. *Id.*

We have recognized that neither distribution scheme will be appropriate to all cases. Rather, the trial court must balance the advantages and disadvantages of each method according to the facts of the case before it in order to determine which method would best effectuate economic justice between the parties.

*Lyons v. Lyons,* 401 Pa.Super. 271, 585 A.2d 42, 47 (1991).

¶ 7  In the instant case, Husband has a defined benefit pension plan and the parties lack sufficient assets to offset the marital value of the pension. However, neither party disputed the trial court's use of the immediate offset method as the proper method to employ under the facts of this case. The trial court concluded, whether correctly or not, that distribution of the pension in this case could not be deferred through a domestic relations order and declined to treat the pension asset separately from the other assets in the marital estate. We remind the trial court the pension is a defined benefit plan wherein the monthly benefit is easily calculable and could have been treated separately and payment deferred.

¶ 8  Regardless of the problems with the trial court's analysis, it proceeded to place a present value on the pension. It added the value of the marital residence, along with other miscellaneous personal property together with the present value of the pension to arrive at the total value of the marital estate. The trial court then determined that Wife was entitled to a 60% share of the total marital estate. The trial court then subtracted the value of the marital residence and various personal property from the total estate and concluded, that for Wife to get 60% of the marital estate she was awarded 50% of the marital portion of Husband's pension. Thus, Wife was awarded roughly 50% of the monthly pension benefit of $869.50 or approximately $435 per month upon Husband's retirement. The methodology employed by the trial court is problematic, but we must focus our review on the limited issue raised, which is the selection of a retirement date for the purpose of valuing the pension.

¶ 9  Further problems arose for the trial court when it next arbitrarily chose a retirement date of fifty to set a present value of the pension. According to Wife's expert pension evaluator when Husband was age

fifty the marital portion of his pension was worth $153,903.19. The expert testified that if Husband chose to retire at age fifty-five, the valuation of the pension would be approximately $104,455.00. The logic of this calculation stems from the fact that the later in life Husband retires, the less checks he will potentially collect before payments terminate at the time of his death. As the number of monthly benefit checks actually issued decreases, the amount of money necessary to fund a defined benefits plan decreases. As noted above, defined benefits plans take into account factors such as early retirement and mortality rates of all of its members in determining what amount of money is needed to fund the plan. Husband, as just one of many members of the plan, is not depleting anything by his continued employment; instead, it merely costs his employer less to fund the pension the longer he chooses to work. However, for the employer, as different members of the pension plan go into and out of pay status through retirement and death, the money needed to fund individual members' pensions averages out.

¶ 10 The trial court concedes its selection of age fifty was an arbitrary age chosen to maximize the value of this asset. By increasing the purported "value" of Husband's pension the court inflated the total value of the marital estate. The effect this valuation had on the ultimate distribution of the estate is that Wife received a greater share.[2]

¶ 11 Upon careful review of the record, we find the pension valuation method employed by the trial court in determining equitable distribution ignores the admitted

fact Husband continues to work. The critical question which effects both equitable distribution and alimony is what present cash value should be assigned to Husband's pension. By not first determining a retirement date as a reference point, any further valuation placed on this asset is speculative. As noted above, at the time of trial, Husband was fifty-two years old, two years beyond the reference point selected by the trial court and Husband had yet to retire. This alone raises a question about the soundness of the trial court's valuation method. Yet ignoring this reality, the trial court arbitrarily selected age fifty as the date of retirement to maximize the benefit of the asset for insurance purposes under the rubric of economic justice.

¶ 12 Assigning a retirement date is a non-computational issue which must be resolved by the trial court and supported by evidence of record. The complexity of the issue is best amplified by matrimonial law expert Jack A. Rounick, who wrote:

> There is ample empirical and statistical evidence to justify the conclusion that all workers do not retire at the same age. A variety of factors impact on an individuals [sic] selection of a retirement age. In the great majority of qualified defined benefit plans the participant is given an option to retire within a range of dates. The breadth of this range is from the date an individual becomes vested and decides to opt for a vested Deferred retirement benefit ... to the date an individual is required to terminate employment as a result of demonstrable physical or mental incapacity to perform.... Because of the actual range of retirement options available to

**2.** If to achieve economic justice, the trial court truly believed Wife was entitled to a greater share, then it should have awarded it to her in the form of a greater than 60% of the marital estate. Instead, the trial court manipulated the "value" of the pension by

selecting an arbitrary retirement date, which is unsupported by the record. Our award of a new trial will give the trial court the flexibility it is entitled to in order to set a new equitable distribution scheme.

the employed spouse, evaluators who assume that all workers retire at the same age or point are to be viewed with skepticism.

Rounick, *Pennsylvania Matrimonial Practice*, Vol. 1B, § 46C:1 at 14.

¶ 13 Our exhaustive search of Pennsylvania jurisprudence has revealed little appellate notice of this problem. However, Husband has suggested that an Allegheny County Common Pleas Court decision in *Bucci v. Bucci*, No. FD83–6072 (Allegheny Cty.1985), *affirmed*, 361 Pa.Super. 631, 517 A.2d 1362 (1986) (unpublished memorandum), *appeal denied*, 515 Pa. 572, 527 A.2d 533 (1987) is helpful. In *Bucci*, the trial court considered how to evaluate future pension payments where the employee/spouse continued to work. Without articulating exactly what factors it considered, the trial court made a factual determination that husband would likely work until age sixty-five. The wife in *Bucci* argued that the retirement age should have been fixed at fifty, on the date the pension first matured. The court rejected this argument stating that "the problem with such an analysis is that it requires the employee spouse to cannibalize himself. If he retires and receives his pension, he is no longer working and cannot receive his salary or wages which are likely considerably higher than the monthly pension payment." *Id.* at 2. The *Bucci* court continued by stating, "in many, if not most cases, the usual retirement age will be sixty-five, for that is the age at which an individual can receive the full Social Security allotment." *Id.* at 3. After hearing testimony from husband, the court decided that he intended to work until age sixty-five because of his financial obligations. At the time of its decision, husband was already fifty-eight years old. By its express terms, *Bucci* does not mandate the use of age sixty-five in all cases struggling with the valuation of a pension plan, but it

does raise a potential framework for how to arrive at a valuation reference point to use when a court is attempting to make a present distribution of a future asset. At the least, the trial court recognized a factual determination of a reference point of husband's future retirement date must be made.

¶ 14 Other than *Bucci*, which we recognize is an unpublished memorandum decision which offers no precedential value, we have found no other Pennsylvania cases dealing directly with this problem. However, we are aware of other jurisdictions that have addressed the question. In *Heike v. Heike*, 198 Mich.App. 289, 497 N.W.2d 220 (1993), the Michigan Court of Appeals reviewed a trial court's valuation of a pension. In considering whether the earliest retirement date permitted by the pension plan was an appropriate reference date to value the pension, the Appeals Court rejected the automatic selection of a speculative date. Instead, it affirmed the trial court's selection of a reference point based on the evidence presented at trial. It approved of the trial court's consideration of Husband's testimony that he would work until age sixty-five so as to provide for the parties' daughter, the minor child's age, and Husband's health and work history. Significant to our discussion, the Michigan Court recognized:

> Circumstances often exist that would make it unrealistic to assume that an employee will retire at the earliest possible retirement date. **Utilizing a fictitious date results in a fictitious value for the asset.** To value a pension on the basis of this required assumption of retirement in the face of contradictory evidence will necessarily result in an unfair or inequitable distribution of this marital asset.

*Id.* at 292, 497 N.W.2d at 222 (emphasis added).

¶ 15 Minnesota Courts have also recognized that valuation of a pension presents complex issues and a need for the trial court to select a reference point supported by the evidence. In the case of *In Re the Marriage of: Fastner v. Fastner,* 427 N.W.2d 691 (Minn.App.1988), the employee/spouse continued to work despite the fact that he suffered from multiple sclerosis which affected his life and work expectancy. Again, the issue for the trial court was what retirement age to assign Husband as a reference point in valuing his pension for equitable distribution. On appeal, the court held in valuing a pension, the trial court's determination of a retirement date must be supported by facts of record or specific findings of the trial court. Where no findings are made and the record is devoid of facts, the trial court must be reversed and the case remanded for further consideration.

¶ 16 Finally, it is worth noting that when this issue arose in the case of *McGowan v. McGowan,* 136 Misc.2d 225, 518 N.Y.S.2d 346, (Sup.Ct. Suffolk County 1987) *affirmed and modified,* 142 A.D.2d 355, 535 N.Y.S.2d 990 (2nd Dept. Dec.30, 1988), a New York trial court found that projecting a date of retirement when the employee/spouse is eligible to retire but continues to work can only be accomplished once the trial court hears testimony, considers the evidence and makes specific findings of fact. In recognizing the need for evidence upon which to base a determination of a reasonable projected retirement date, the trial court suggested certain factors that should be considered. The factors include the parties' respective age and health; the presence of minor children; employment opportunities elsewhere; present and future financial circumstances; mental disposition toward continued working at a later age; probability of incentives for early retirement; future intent; and statistics as to what age people employed in the same job, occupation or profession normally retire. *Id.* at 232, 518 N.Y.S.2d at 351.

■ ¶ 17 Here, there is nothing in the record to support the arbitrary selection of age fifty as the reference point. Since it is evident Husband continues to work well past age fifty, the reference point erroneously assigned by the trial court, some other method must be employed to determine his future retirement date. A remand is in order for the trial court to develop a record. If the employee/spouse presents credible testimony as to his anticipated date of retirement, the issue is simple. The problem arises in the event the employee spouse has no intention of retiring. Under such circumstances, we find it is incumbent upon the trial court to consider the following factors in projecting a retirement date:

(1) statistical data regarding average age of retirement from the company or industry with which employee/spouse is affiliated;

(2) the employee/spouse's age;

(3) the employee/spouse's health;

(4) the nature of the work;

(5) incentives to continue to work;

(6) employment opportunities elsewhere;

(7) present and future financial circumstance;

(8) mental disposition toward continued working; and,

(9) probability of an offer of added pension benefits as an incentive to early retirement.

¶ 18 Certainly, a trial court would not expect an employee with an intensely demanding physical position to have the same longevity as a sedentary worker. In the present case, we can only speculate as to the demands placed on this employee/spouse in his occupation as a police officer. Error arises here because the rec-

ord only supports Husband's intent to continue working; it is totally devoid of any evidence he will retire in the near future, and yet the trial court assigned a retirement date that has already passed.

¶ 19 The trial court is under the mistaken impression that each year Husband continues to work beyond age fifty he reduces the marital component of the pension as well as the value of the pension itself. This assumption is simply not true. As a defined benefit plan, the marital component is fixed at $869.58, regardless of the date of retirement. Admittedly, less money is required to fund a fixed pay-out plan over a shorter period of time, but this argument begs the question of what value should be placed on a defined benefit plan when the employee/spouse has not yet retired. Furthermore, the trial court seems to find something sinister about Husband's ability to control the disbursement of the pension, yet it never made a finding that Husband's continued employment is ill-motivated. We must be mindful that the pension at issue is nothing more than deferred income earned during the marriage and not realized until retirement. Wife is only entitled to collect the benefit when Husband does. In conclusion, the date of Husband's retirement is speculative, and the trial court lacked any basis in using age fifty as the date of retirement.

¶ 20 Next we turn to the trial court's award of alimony to fund a term life insurance policy on the life of Husband of which Wife is the beneficiary. By utilizing an insurance policy, the trial court is awarding Wife benefits she would not be entitled to collect should Husband prematurely die. We are compelled to address this issue because the award of alimony is inextricably tied to the equitable distribution scheme established by the trial court.

■ ¶ 21 Alimony is based on the reasonable needs, in accordance with the lifestyle and standard of living established by the parties during the marriage, as well as the payor's ability to pay. *Twilla v. Twilla*, 445 Pa.Super. 86, 664 A.2d 1020, 1022 (1995). When determining the nature, amount, duration and manner of payment for an award of alimony, the trial court must consider the factors set forth in 23 Pa.C.S.A. § 3701.

■ ¶ 22 According to the equitable distribution Order, Wife was awarded alimony in the amount of $100.00 per month for a term of twenty years. This award is purported to be based on a review of several factors set forth in § 3701. However, the trial court provides no findings of fact or conclusions of law to support how it arrived at this award. Instead, the alimony is merely a stream of income to fund a term life insurance policy, which we believe constitutes a double award. The alimony award has no relation to the length of the marriage, the relative earning capacities of the parties, the obligations to minor children, the relative assets and liabilities of the parties and the relative needs of the parties. Moreover, requiring Husband to pay twenty years' worth of alimony following a twelve-year marriage appears inequitable considering Husband's payment of alimony and child support over a seventeen-year period, especially in light of Wife's earning capacity and the award of the marital residence and lack of outstanding child support issues.

¶ 23 Still, we question the fairness of the alimony award to fund a term life insurance policy. If Husband should die at age 69, Wife will have received her marital portion of his pension checks from the date of his retirement until he dies, in addition to the lump sum benefit from the insurance policy worth approximately $77,121.00. Husband's estate will receive nothing. If Husband should die at age 71, Wife again will have received her marital portion of his pension checks from the date

of his retirement until he dies with no additional award to either party. If the trial court had wanted to protect Wife's marital portion of the pension by having Husband fund a term life insurance policy, why stop at age 70?

¶ 24 Finally, we stress any disruption in the trial court's initial valuation of the pension, necessarily changes the entire equitable distribution scheme. A present value was placed on the marital portion of the pension which was then added to the value of the house and incidental marital assets. The court then divided the total in a 60/40 split. Once the value of the house which was awarded to Wife was subtracted out, Wife then received approximately fifty percent of the marital portion of Husband's pension benefits. If the value placed on the pension is changed, Wife's proportional share of the pension is changed as well. Thus, we vacate the trial court's equitable distribution order in its entirety.

¶ 25 In conclusion, the trial court's attempt to employ an unavailable partial offset and error in selecting an inappropriate reference point to determine the present value of the pension in question, resulted in an economic injustice in this case. Accordingly, the Order of the trial court is vacated and this matter is remanded for a new trial. The trial court is free to reassess the distribution method in light of the problems we have highlighted. In the event the trial finds it necessary to place a dollar value on the pension, it should do so only after establishing a factual basis upon which a proper reference point can be selected by considering the factors set forth above.

¶ 26 Order vacated. Case remanded for further proceedings consistent with this Opinion. Jurisdiction relinquished.

¶ 27 TODD, J. joins.

¶ 28 KELLY, J. files a Dissenting Opinion.

KELLY, J., dissenting.

¶ 1 I respectfully depart from the majority disposition because I think the trial court's decision to value Husband's pension plan for purposes of equitable distribution as if he retired at age fifty should be affirmed. I also disagree with the majority's criticism of the trial court's award of alimony to insure Wife's portion of the pension benefits. Finally, I take issue with the majority's assertion that the "monthly benefit is easily calculable and could have been treated separately and payment deferred." Hence, I dissent.

¶ 2 The majority's analysis is grounded in the assertion that a trial court must first approximate the pension holder's retirement date before it may value such a pension. The majority suggests this is the only "realistic" way to value such an asset. However, equitable distribution schemes in Pennsylvania are traditionally assigned to the discretion of the trial court because we recognize that no two estates are identical. *See McNaughton v. McNaughton*, 412 Pa.Super. 409, 603 A.2d 646 (1992). Thus, Pennsylvania law allows the trial court freedom to apply its equitable tools to the task of distribution to create a fair and "realistic" division given the parties' assets and abilities. *Smith v. Smith*, 439 Pa.Super. 283, 653 A.2d 1259, *appeal denied*, 541 Pa. 641, 663 A.2d 693 (1995). Our limited review of such distribution schemes acknowledges that "value" has many definitions, but so long as the division of the marital estate is fair, the scheme will not be disturbed. *See generally id.; McNaughton, supra.*

¶ 3 No doubt, the retirement age of fifty was an arbitrary one chosen to maximize the value of this asset. Nevertheless, any

estimate of Appellant's actual retirement date would necessarily be equally arbitrary. Thus, the chance of any other date setting a truer "value" of the pension is no greater than the "arbitrary" date chosen by the trial court. That is so, even where the court picked a valuation age of fifty, but where Appellant is fifty-two and still employed.

¶ 4 Maximizing the purported "value" of Appellant's pension by choosing to value it at a retirement age of fifty does not penalize Appellant. As the majority admits, the effect this valuation had on the ultimate distribution of the estate is merely speculative. Had the trial court chosen a later date, the distribution of that asset could have changed as well.

¶ 5 Moreover, the majority has not offered any precedent for its assertion that a trial court must first estimate the actual retirement age of the pension holder before the court may value the pension. The cases the majority cites arguably do not support such a procedure under all circumstances. *See, e.g., Bucci, supra,* and the cases cited by the majority from other jurisdictions; namely, *Heike, supra; Fastner, supra; McGowan, surpa.* Most notably, the court in *Heike* stated,

> The trial court is in the **best position** to determine the proper date and method of valuation on the basis of the circumstances of each case. We therefore hold that no one valuation method is **required**; rather, the trial court, when valuing a pension, is obligated to reach a fair and equitable division of the property in light of all the circumstances.

*Id.* at 292, 497 N.W.2d at 222 (first emphasis added; second emphasis in original).

¶ 6 While the majority's procedure for valuing a pension plan may work for some cases, it should not be made mandatory for all cases. Such a rigid rule overrides the discretion afforded trial judges and devitalizes their equitable powers when distrib-

uting the assets of a marital estate. Moreover, application of the majority's rule to the instant case needlessly disturbs an otherwise fair and equitable distribution of the parties' assets.

¶ 7 I now turn to the court's award of alimony to insure Appellee's award of a portion of the pension benefits. The majority suggests that the alimony award bears "no relation to the length of the marriage, the relative earning capacities of the parties, the obligations to minor children, the relative assets and liabilities of the parties and the relative needs of the parties." The majority also states that the twenty-year duration of the award "appears inequitable" considering the length of the marriage and the alimony already paid by Appellant. I disagree.

¶ 8 Appellant's pension plan does not provide for survivor benefits. If Appellant were to die while he was still employed, then Appellee would receive nothing. If Appellant died in early retirement, then Appellee would receive no further benefits after his death. The parties lacked sufficient assets to offset the pension, the pension is not realistically subject to a Qualified Domestic Relations Order, and the pension lacks survivor benefits. As the date of Appellant's actual retirement was unknown and the possibility that Appellant's untimely death or lengthy employment would prevent Appellee from receiving any "value" from the pension as distributed, the court could not simply treat the asset separately and defer the payments. Additionally, had the court treated the pension separately, the distribution of the meager remaining assets of the marital estate would have been inequitable. Rather than gamble on the amount of monthly retirement checks Appellant would actually receive, the trial court ordered Appellant to pay a modest amount to Appellee in the form of an alimony

award so that Appellee could purchase a term life insurance policy to protect her award of her marital portion of Appellant's pension. Casting the award as alimony is favorable to Appellant in the form of a tax break, while it benefits Appellee by funding a policy to protect a portion of an asset she has been awarded but otherwise may never receive.

¶ 9 Moreover, the trial court awarded Appellee an equitable share of that portion of the pension earned during the marriage. In arriving at the size of this share, the court considered the length of the marriage, and the relative earning capacities, assets, liabilities and needs of the parties. The purpose of the alimony award was to insure Appellee's portion of this asset should Appellant not enjoy a normal retirement. Thus, the alimony award protecting Appellee's portion of the pension is directly related to the alimony factors of 23 Pa.C.S.A § 3701 cited by the trial court.

¶ 10 It bears repeating that the increased monthly benefits Appellant will receive from continued employment inure principally to him. Arguably, the only person penalized by Appellant's continued employment is Appellee, who must wait for Appellant to retire before she can receive any monthly benefit from this asset. Other than the house, Appellee essentially receives nothing more in the equitable distribution plan until Appellant decides to retire, a decision entirely under Appellant's control. By requiring Appellant to pay alimony so that Appellee could insure her share of the pension, the trial court protected Appellee's financial wellbeing while she waits an indefinite amount of time for the pension distribution.

¶ 11 Additionally, the majority mischaracterizes Appellant's pension benefits so that it appears Appellant's monthly benefits are constant. However, only the marital portion of these benefits remains constant. Appellant's monthly pension benefits continue to increase the longer he works. Thus, while Appellee's equitable share of the marital portion of Appellant's pension is fixed at $435.00 per month, Appellant's monthly pension benefits if he retired today would be well in excess of $2,000.00. Furthermore, as Appellant continues to work and collect salary, the amount of his monthly retirement benefit grows.

¶ 12 The division of Appellant's pension as a percentage of the equitable portion of the monthly retirement benefits, coupled with alimony payments to insure the award, allowed the trial court to relinquish jurisdiction. Thus, the court's decision to order alimony for the purchase of an insurance policy had the added benefit of avoiding the need to retain jurisdiction indefinitely. *See Miller, supra* (stating immediate settlement of distribution preferred because it avoids continued entanglement between the parties and continued court supervision).

¶ 13 Finally, the trial court compared the valuation of the instant pension plan for distribution purposes to that of a closely-held business. The court said:

There is no established date for valuation of marital property because the court's objective is to effectuate economic justice. *McNaughton*[, *supra*]. In *McNaughton,* the Superior Court found that the trial court properly valued appellant's business at the time of separation rather than at the distribution where appellant's business was family owned and "largely under the control" of appellant's influence. In the similar case of *Benson v. Benson,* 425 Pa.Super. 215, 624 A.2d 644 (1993), the Superior Court determined that the trial court did not abuse its discretion in valuing a former appellant's business at the time of separation where the equitable nature of the Divorce Code warranted a separa-

tion date value because the business was "under the sole control" of the former appellant. In the instant case, the marital value of Appellant's pension is similarly under his control and diminishes as his employment continues. Therefore, the Court properly and equitably valued the marital component of the pension on the date it vested and full benefits first became available.

(Trial Court Opinion at 5). While Appellant's pension plan is not identical to a closely-held business, the trial court's comparison of the two is persuasive. As noted, Appellee does not receive any portion of Appellant's retirement benefits until Appellant chooses to retires. **When** Appellant retires is solely within his control. Thus, Appellant controls the number of monthly retirement checks Appellee will share, and consequently, the value she will ultimately derive from this asset. To be fair, the court choose a date that will maximize the value of this asset for insurance purposes in the event Appellant suffers an untimely death. In fact, the instant distribution is more favorable to Appellant than he would care to admit.

¶ 14 Based upon the foregoing and viewing the trial court's equitable distribution as a whole, it is my opinion that the court's order effects economic justice between the parties while wisely vitiating the need for continued court supervision. Consequently, I do not think that the trial court abused its discretion. *See McNaughton, supra; Miller, supra; Lyons, supra.* Accordingly, I dissent.